Welcome to Atlanta, and this is incredible. We'll try, try. We've abandoned. Hello. Okay. We'll try it again. Good morning and welcome to the second day of our panel sitting in Atlanta. It's a busy week. We have two panels going on, the other one at the end of the hall. Before we start, Judge Grant and I want to acknowledge and thank Judge Eugene Seiler from the Sixth Circuit for being with us. He has been a frequent visitor to the Eleventh Circuit and helped us out a ton over the years, although he told me he hadn't been to Atlanta too many times. He's been to other locations in the circuit, but we're thrilled to have him help us with our work. You know the lighting system. When the yellow light goes on, that means your time is drawing to a close, so try to finish up your remarks. If we take you beyond the red light, then don't worry about it. You're on our time and not yours. And with that, we'll begin. Our first case is number 16-16982, United States v. Chavez Hunter. Mr. Dodson. Good morning, and may it please the Court. My name is Jonathan Dodson, and I'm representing Chavez Hunter. Terry v. Ohio set the floor on when an officer may seize a person. You can never do it based only on a vague suspicion. It has to be an articulable suspicion and one that reasonably points to some specific type of unlawful conduct. Before you get into the vague part of your argument, when do you think that Mr. Hunter was first seized in a Fourth Amendment sense? I believe he was first seized at the time that the officer confronted him with the fact that he's investigating a suspicious incident. Based on that, the fact that he engaged his blue lights and that he parked his car in a way that impeded Mr. Hunter's path, where he would have to walk between the car and the woods and brush by the officer to continue, I believe at that point a reasonable person would not have felt free to ignore the police officer. Particularly in light of the blue lights, which I recognize the officer testified that that was for a safety concern, and I'm sure subjectively that was. However, that's what headlights are for and taillights are for. And what makes blue lights different is that only police cars have them, and it's meant to signify authority. And so I think that's what a reasonable person would have interpreted that to mean. That made it a lot more like a traffic stop where we all know that when blue lights are pointed at us, then that means we're supposed to stop. Then it did a consensual street encounter. So if he hadn't turned on the blue lights, it wouldn't have been a seizure? I think it would have been a weaker argument that it was a seizure. I also think it's significant that he parked in a way that his bumper was facing Mr. Hunter and that it didn't block Mr. Hunter, but it gave him a very narrow egress between those woods and that car. I think that would have indicated that Mr. Hunter was stopped as well. Having said that— What could he have done to not seize Mr. Hunter if he came back to talk to him? I think he could have engaged him in the way he did the first time, which is to stop and talk to him through the window. Stop where? On either side of the road. He stopped on the opposite side of the road initially, so it wasn't blocking or impeding Mr. Hunter in that way. And I think that would have been perfectly permissible. But to stop in front of him the way that he did, especially after already speaking to him and turning around in front of him, and especially when involving the blue lights, I think conveyed to a reasonable person that he was being detained temporarily. Well, it would have been kind of hard to speak to him across the road, wouldn't it? I mean, it's much better for your client that the officer get closer instead of shouting to him across the road. I recognize that he would have had to shout, but he did do that initially. That is how he spoke to him initially. How wide is this road, do you know? It was a two-lane road, and it was wooded on either side. I don't think there was any testimony. There was a lot of other traffic. It was pretty late. Three in the morning, wasn't it, or something like that? Yes, it was almost three, I think is what the officer said. I want to emphasize, however, that I'm not sure that this court would have to determine precisely when Mr. Hunter was seized because even at the point that everyone agrees that he was seized, which is when the officer placed him in the back of the car for nine or ten minutes while they investigated the firearm, even at that point, the officer didn't have anything more than a vague suspicion. He didn't have a reasonable suspicion. What the Georgia legislature has recognized is what the constitutional standard is, which is that you need something that points towards unlawful behavior, and carrying a concealed firearm doesn't say anything about whether that's lawful or unlawful. But the district court thought maybe correctly, maybe incorrectly, that the Georgia law didn't eliminate common sense in the district court's perspective. Take as a given, as we have to, that the Georgia law is on the books and that you just can't stop and investigate somebody to see whether or not they have permission to carry the firearm. A police officer sees somebody walking down the road with two weapons, a pistol hanging on each side of the belt. A police officer can't do anything? I think the police officer could have a consensual encounter, but a police officer cannot just disarm anyone. Hey, those are good-looking guns. Well, how are you doing this evening at 3 o'clock in the morning? Those look really good. There's nothing else a police officer is supposed to do in that sort of a setting? I mean, it's one thing to say you can't check for a license, a specific state type of license. It's quite another to say that the police officer can't take any action besides asking a question. And I wouldn't say that he can't take any action, but what the reasonable suspicion requires is something just a little bit more than the possession of firearms, something that would distinguish between lawful and unlawful behavior. An officer could see a police car, a regular car, and think some cars are stolen, some people don't have licenses, but he needs something to indicate unlawful behavior to pull that car. But the possession of the gun itself need not be unlawful to create reasonable suspicion. In other words, you could have a gun legally and be up to no good with the gun. That's true. And that could give you reasonable suspicion, for example, in the hypothetical, to think that someone is not going to be walking the streets or the countryside with—maybe the countryside, but not a city street with two guns at 3 o'clock in the morning. Right. First, I want to say that the officer did say that this was a highly populated area, although that particular stretch of the road was wooded, and there was no testimony that it was a high crime area. And second, I would still say that there needs to be something. And yes, reasonable suspicion can be based on entirely innocuous factors, but they still need to somehow distinguish, point towards something unlawful and not be indifferent as to whether it's lawful or unlawful. But the officer offered him a ride since your client said he was going about five miles down the road at 3 o'clock in the morning, right? Right. Your client could have turned him down, and that would have been the end of the case, right? I believe he was seized before then. Do you think it was a forceful— I think it was a submission to authority. Okay. Would we have to disagree with the factual conclusion of the district court to agree with you there? Because the district court did conclude factually that it was an offer rather than a demand. I think even if it would otherwise have been involuntary or had been voluntary, the fact that it occurred after an unlawful seizure would mean that it was a fruit of that unlawful seizure. So I don't believe you'd have to disagree with that particular conclusion that he voluntarily accepted the ride to find that if it followed or if it happened during an unlawful seizure, then that ride did not attenuate that unlawful seizure. If we disagree with your initial argument about where the seizure first occurred, what's the fallback position about when the seizure next occurred, before the district court thought it did or at the time the district court thought it did? The fallback position is when the district court said it did. Okay. And I want to emphasize that the district court said it was when he responded to the proposed risk with a little bit of tenseness, which was before he asked Mr. Hunter whether he had a firearm, and Mr. Hunter said that he did. So the firearm would still have been a product of that seizure and not something that goes into the reasonable suspicion analysis. And the reason that I agree that it was at least seized by then is that not only did he start closing the distance between the two of them, but he testified that he was saying, whatever it is, just don't go for it. So he ordered Mr. Hunter, don't go for it, and that restrained his bodily movement, and that made it a seizure at that point. And then he asked, do you have a firearm? And Mr. Hunter acknowledged that he did. If I haven't emphasized it enough, I also want to say that even if the seizure was at that last point, even if the frisk was lawful and understandable as a safety concern, there was no reason to detain him in the back of the car for 9 to 10 minutes rather than taking him to his destination. That's where he was, again, just acting on a vague suspicion about this gun. He could have run the information while he gave him a ride, and if it came back before he got to his destination and if that ride were otherwise voluntary, then in that event it wouldn't have been an unlawful detention. But he detained him for 9 to 10 minutes. He detoured from the purpose of giving him a ride to his destination, and he did so based on the fact that there are some guns that are stolen and that some people don't have permits without anything to indicate that Mr. Hunter was one of those people or that this was one of those guns. Do you think there's anything you can do under Georgia law on the restriction of detaining someone merely for checking to see if they had a permit? Do I think there's any? I think that with something more, an officer can detain someone to check a permit. For example, the district court cited the Kubler case where the fact that they were in a convenience store and the defendant actively covered up the firearm when he saw the officer, that was more of a furtive movement that indicated criminality, not just carrying of a firearm. But I think if all the officer has is that you have a firearm, then other interests come into play in the Fourth Amendment, and the officer cannot detain a person or frisk them. They could seek consent, they could ask questions, but they couldn't implicate the Fourth Amendment based only on the carrying of a firearm. Do you think there's any daylight between the Fourth Amendment and the Georgia rule against detaining someone just to check that? I don't think so. I think that the Georgia rule recognizes, reflects a constitutional standard, which is, again, that it needs to point towards something unlawful, and mere carrying a concealed firearm doesn't say anything about whether it's lawful or unlawful. Thank you. All right. Thank you very much. Ms. Feinberg. Thank you, Your Honor. May it please the Court, good morning. My name is Lindsay Feinberg. I'm here this morning on behalf of the United States of America. As oftentimes, when I'm up here, the panel's questions lead me to change what I thought I was going to talk about. So if I may beg your forgiveness, I'm going to change what I thought my remarks would be this morning. And I'd like to start by addressing Georgia Guns Everywhere and the reach of Georgia Guns Everywhere. Now, as the Court has alluded to in its questions, Georgia Guns Everywhere prevents an officer from detaining someone solely to inquire as to whether or not he or she has a valid license to carry a firearm. The key statutory language there is, of course, solely. This case does not fall within Georgia Guns Everywhere, either factually or legally. As a factual matter, review of the testimony that the district court recounted and review of what Deputy Cote actually said at the suppression hearing said that he did not detain Mr. Hunter solely to learn whether or not he had a valid license for the concealed loaded gun he had in his waistband. The record here helps your position, but isn't the likely result going to be that most police officers, when put under oath, are going to say, I didn't do it solely to check that? Because they know if they say that they did do it solely to check that, then the Georgia law is going to cause problems. So it's an easy out. I mean, we're, of course, bound by the district court's factual findings in this case. But, I mean, you're going to have police officers admit on the stand generally that they, yes, I violated the law. I stopped him and did it for a reason that the Georgia legislature said is not permissible. I would never put an officer up on the stand to lie to the court. And if in considering whether or not to indict him. I know, but you don't know. Right, but I guess you're on a gamble. Well, sometimes a prosecutor has really good reasons to think that a witness is not being completely candid. Sure. But sometimes a police officer, sometimes a prosecutor just doesn't know. Well, while I am not Deputy Cota and I cannot speak to what was in his mind when he testified before Judge Treadwell back in September of 2015, I think at this point, I would say two things. One, any time a police officer is called to the stand, he or she is under oath. So there is an expectation that what they're telling the court is truthful. And I would hope that that oath means something to them as law enforcement officers and just as people in the world. And secondarily, I would say while you're… You can also say that about criminal defendants when they're put under oath and the government often contends that their testimony is not worthy of belief. So I take what you're saying and I understand it, but there are times when witnesses aren't completely straightforward. Exactly, and that is why we have an adversarial system. So in such an instance, Your Honor, that gets to my second point I suppose, you would hope that you have a robust defense lawyer going after that exact point. That isn't it in fact true, Officer So-and-So, that you did detain Mr. Such-and-Such solely because he had – you realized he had a concealed weapon. I mean that is why we have an adversarial system and that's also why we let district courts view everything in the first instance and we defer to their credibility determinations and their factual findings. And here we've got great facts in the government's favor. And in fact, when we look at sort of the eight factors that this court typically looks at for when a detention occurs or when it's a police-citizen encounter that's consensual, the district court's findings here weighed in on seven of those eight factors and all of them favor the government's position, which is that Mr. Hunter had not been detained until, as the district court found, at the earliest, sometime after he reacted to the statement of the protective pat-down. Now, opposing counsel spent some time talking about factors in his view that changed that analysis, but those factors aren't the same eight factors that this court has set forth. And as to one of them, the one that he emphasized in particular, the blue lights, I would point out that in a previous decision, the Lewis case, which is cited in the government's brief, this court went out of its way to say that the presence of blue lights and high beams do not in and of itself take a consensual encounter and make it an investigatory seizure. What about blocking his path? His path, I think that's factually just simply inaccurate, Judge Grant, that his path was blocked. The testimony from the suppression hearing that Deputy Cota gave was that he specifically parked his vehicle in the road in the way he did so as to not block his path, and that when officers are trying to block someone's path, they do so in a different way. They sort of put their vehicle on an angle. And so he went out of his way to not prevent Mr. Hunter from leaving when he was speaking to him. Was there any testimony to show that the car had blocked the path, or was that just the position of the defendant? That is the position of the defendant because of the nature of the roadway and the fact that there are no sidewalks, that his path was somehow blocked because he would have had to continue walking along the side of the road. That's true of a lot of country roads, though, is it not? Yes, Your Honor. And it's also true that he was initially walking along the side of the road. You know, Deputy Cota did not testify that he saw him walking in the roadway where the vehicle was subsequently parked. He testified that he was walking along the side of a dark roadway between 2 and 3 in the morning in a largely residential area where a crime had been reported less than an hour ago. Your summary of argument says that the encounter escalated into an investigatory seizure when Hunter reacted to Deputy Cota's statement about protocol requiring that Deputy Cota pat Hunter down. You're saying the seizure occurred when the defendant reacted. Does the seizure require some action by the authorities? I actually agree with opposing counsel's fallback position here that if I were to drill down on that exact moment, I think when Mr. Hunter put his hands up and Deputy Cota said, whatever it is, don't reach for it, I'm going to go for it, I'm going to take it from you, when he learned that there was a weapon tucked in the front of his pants, that at that point what had previously been a consensual encounter did transform into, I would say, a Terry frisk at that moment, and then it blossomed into a brief investigatory seizure, which is completely consistent with Terry. So at the moment that the officer started moving toward him and told him not to do anything? Yes, because at that point, as I think opposing counsel rightly points out, you do have a submission to a show of authority. I mean, at that moment, Mr. Hunter raised his hands. Deputy Cota closed the five and between five to six feet that were between them and said, whatever it is, don't go for it, and then he explained that he had a gun tucked in his waistband, and then the deputy went and seized that gun to separate Mr. Hunter from the weapon, which Deputy Cota further testified was solely done for safety reasons. When did Hunter first say he had the weapon? Was it when the search was going on or when he said he had to search him to get in the back of the car? He did not say that he had. So the timeline of events, Your Honor, although the testimony at the hearing is not perfect in this respect, appears to be that Deputy Cota offered Mr. Hunter a ride to his girlfriend's house in Unionville, which is over five miles away. At that point, Mr. Hunter said, sure, I'll take a ride, and after accepting the ride, Deputy Cota said, okay, just so you understand, in order to put you in the back of my vehicle, department policy requires that I do a protective pat-down to make sure you don't have anything that can hurt me. Now, after that statement was made, according to the district court's factual findings, Mr. Hunter's demeanor immediately changed. He became tense, and the whole tenor of the encounter, which at that point, up until that point, had been very calm and cooperative, shifted, and reading the situation in a split second, Deputy Hunter then said, whatever it is, don't go for it, and then proceeded to ask Mr. Hunter if he had a gun. Mr. Hunter responded in the affirmative that he did, that it was tucked in his belt loop up front, and he put up his hands, and then the deputy went and separated Mr. Hunter from his concealed weapon. Couldn't anyone have a nervous reaction to being searched or patted down? I know people don't love the TSA line, for instance, even though all the people who don't love the TSA line aren't carrying weapons with them. Couldn't that just be a natural reaction that anyone would have to the idea of being patted down? Yes, it could, but we don't look at things in isolation, or this court certainly doesn't. Rather, we look at the totality of the circumstances, and I think when you are an officer alone on the side of a dark road with another person at 3 in the morning who you thought you were just going to put in your car and do him a favor, when everything sort of changes in that minute, we have to defer to what officers are reading about what the totality of the circumstances leads them to conclude and whether or not they believe objectively that their safety has been threatened. And the fact that Mr. Hunter was carrying a, was armed means that he was therefore dangerous. Until an officer knows that someone is, does not pose a danger to him, whether that person be carrying a weapon lawfully or whether they be carrying a weapon unlawfully, it's the existence of the deadly weapon, I would say. It's the existence of the gun that changes this from a TSA encounter. Wouldn't, couldn't this be a ticket for an officer to search anyone in this circumstance? Let's say, let's say the officer offers the person a ride. If someone turns down a ride for 5 miles, isn't that itself suspicious? Couldn't, couldn't the officer think, well, why wouldn't they want a ride with me if they're, if they're just really wanting a way to go 5 miles? With all due respect to Deputy Cota, I wouldn't get in a strange man's car at 3 in the morning, so I would have felt free to say no. But, again, the question is what a reasonable person would say, and the testimony at the suppression hearing was that in Deputy Cota's estimation, people regularly walk away from him, and they regularly may accept or may not accept a ride, and he just defers to what that individual does in that instance. He does not believe it's reason for him to continue some sort of seizure or expedition into whether or why that person does not want a ride to their destination. And going back to the notion of Georgia guns everywhere, I just want to make clear that in addition for it not really being factually on all fours with what transpired here, that as a legal matter, and, again, this was brought up in my brief, that even though under Georgia law an officer can't detain someone who's carrying a concealed weapon solely to determine whether they have a valid weapons permit, I think Supreme Court precedent makes it clear that police officers have every right to frisk a suspect if they reasonably believe that suspect to be armed, even when that suspect possesses that weapon lawfully under state law. And those two cases would be, of course, Adams v. Williams, in which the Supreme Court emphasized that the purpose of a Terry frisk is not to be discovering evidence of a particular crime, but, quote, to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable whether or not carrying a concealed weapon violated any applicable state law. That second case would be Michigan v. Long, in which the Supreme Court again made clear that we have expressly rejected the view that the validity of a Terry search depends on whether the weapon is possessed in accordance with state law. So the fact that Georgia law permits people to carry a gun does not mean that that is carte blanche for officers to ignore objective and legitimate reasons to be concerned about their safety. All right. The thing is that here the seizure probably occurred before Officer Cota had any clue that Mr. Hunter was armed, right? Not necessarily. Again, it's tricky because— What information did he have to suggest that Mr. Hunter was armed before he seized him? He did not have any—to answer your question, he did not have any reasonable suspicion that he had a concealed weapon at the time he reacted, but I would point out that in— So what's the reasonable suspicion for the seizure? No one doubts that you can conduct—at least I don't doubt that you can conduct a Terry frisk when you conduct a stop that is supported by reasonable suspicion. But where's the nexus here? Well, I think the nexus here comes at the distinction between a Terry frisk and a Terry stop. And I would say that what happened here as a practical matter is they happened almost contemporaneously. So we have a situation where an officer has an objective belief that his safety may be endangered because of a sudden change in a situation, and that leads that officer to seize the weapon pursuant to a Terry frisk. Now, it is true that as a timing matter these happened perhaps bang, bang, one right after the other, but practically speaking, Your Honor, I think the truth of the matter is we don't want officers trying to second-guess themselves when they're making those split-second decisions about whether they have sufficient reasonable suspicion if they feel like their lives are in danger or if they feel like people around them may be in danger. And I think anytime someone is faced with a situation like this with an individual who's armed and unknown to them, we'd rather err on the side of safety for everyone involved. Well, you're saying that in hindsight he was armed because you know he was armed because they found a gun on him, but at the time he didn't know. That is true, but of course the encounter remained voluntary when Mr. Hunter accepted the ride. And when he was told of the protective pat-down, he did not reject the offer of a ride and say, You know what? I'm good. I don't want a protective pat-down. I'm going to keep walking on my way. And what happened next, while the testimony at the hearing is not perfectly clear about the exact timeline of events, is that within seconds Deputy Cota had to make a decision. And that decision was, Do I put this person in my car when their demeanor and body language is suddenly changed and they may have something that will pose a risk to me, which of course we don't want to happen for anyone, or do I terminate the encounter and say, Actually, I can't give you a ride after all. It's incumbent upon the officer to renounce the offer in that case. That might be, I mean I speak only for myself, that might be the fact that changes the outcome here or at least supports the district court's ultimate ruling because if, as the district court found, the acceptance of the offer to take a ride was voluntary and not submission to authority, then Officer Cota was permitted to do what he did to ensure that he could put Mr. Hunter in the back of the car. Yes, and if I may, I see my time's about to expire. May I say two things in response, Your Honor? Sure. First, that what Deputy Cota was doing in that instance was consistent with the community caretaking function. That's what he thought he was doing. He thought he was helping someone who needed to get five miles away, something he'd done previously. It was not as though it was a pretextual elaborate subterfuge to try and figure out whether Mr. Hunter had any contraband on him that would form the basis of a criminal conviction. And second, the district court's factual finding was not clearly erroneous in that regard. And it's true, getting back to a question that Judge Grant asked opposing counsel, that to rule in Mr. Hunter's favor, you would have to find the district court's factual finding that it was a benevolent offer as opposed to an order or command was clearly erroneous, and the record simply doesn't support any such finding. Thank you. All right. Thank you very much. I want to first respond to what happened exactly. As the government said, the frisk happened very shortly after the tense reaction. But it's my position that that transformed what might have been a voluntary frisk into an involuntary one because Mr. Hunter never had an opportunity to decline. It happened quickly. The officer was asked, did you tell him you have to accept this frisk no matter what? And he said, I don't believe I said anything else after that. He saw the tense reaction and he moved closer to him and told him, don't go for it. So even if it had been voluntary. You admit your client agreed to accept the ride, right? Yes. Yeah, I don't think that I can second guess the district court's factual finding that it seemed he hesitated, but the officer testified he did accept the ride. But he didn't get an opportunity to accept or decline once he knew that it was going to come with a frisk. Don't you think that the don't go for it statement by the officer could be evidence that he did actually sense some danger, that it wasn't a pretextual search? And I don't know that it was a pretextual search, but the officer also said that that's something he always says, that that's his way of doing things. He specifically said, even if I don't think they have anything, when I'm about to frisk someone, I tell them don't go for it. Don't reach. And so I don't know that that would indicate that. A legitimate safety concern has to be premised upon a legitimate stop, a reasonable suspicion. I don't think Terry authorizes freestanding frisks just based on possible safety concerns when it's not premised upon a legitimate stop. I think that a case that the government cited in its supplemental authority, Simmons, provides a really good example of an officer handling a situation just right. He saw a clip on a defendant in a car that he knew was probably associated with a weapon, but he did not immediately pull the defendant out of the car because it's not the same thing to be armed and to be armed and a safety threat. It was after he questioned the defendant. The defendant wasn't responsive, and he made some furtive movements and turned his back to the officer. That was the point when he concluded this is a safety concern, and he pulled him out of the car. Here, the government suggests that the entire tenor of the stop changed when the officer noticed a little bit of tenseness. But what the officer said was it was a little bit of tenseness, not a dramatic scene or anything. And then later, when the officer was being questioned on the transcript at page 38, line 14, he said the whole time he was cooperative. We never had any confrontation or any situations like that. So I felt a little bit more relaxed during the situation only because, like I said, he was cooperating. He wasn't giving me any signs he was going to do harm or anything. The officer was effusive in saying that it was a cooperative and calm encounter throughout. And the last thing I want to highlight, again, is that even if he wasn't seized until – even if he could frisk him lawfully, again, he was detained for nine to ten minutes based only on investigating the firearm. And he testified – and this is page 39, line 23 – I wasn't trying to build a case at the time. I mean, if it came to the circumstances, for instance, for the lawnmowers and all that being stalling, if I had evidence that led to it, I would have furthered that investigation. But once I realized that I didn't really feel like he was that individual, it was just merely to help. I'm going to take you a little bit beyond your time given that argument you just made. How does that help you if the gun was obtained before the other detention in the back of the car? The gun is the evidence that led to the charges. The detention in the back of the car would have suppressed what? Well, I don't believe he had reasonable suspicion to investigate the gun. He could separate him from the gun and take him to his destination. But, again, I would say that carrying the concealed firearm alone is not evidence of a crime, is not reasonable suspicion of a crime. And so for that reason, to detain him there instead of just taking him to his destination, I mean, he had already – but then to detain him to pursue a separate investigation into that gun without any evidence that the gun was unlawful. What's the officer supposed to do at that point, give him back the gun? And he testified he intended to if it came back. Yes, he would take him to his destination. No, but I'm saying without checking anything. He just takes the gun and then he says, okay, here you go, gun back. I think so, without evidence that the property is unlawful, any more than an officer could investigate any property without reasonable suspicion. And he would have put him in the back of the car with the gun? No, no, he could keep it separate as incident to a voluntary – if it was a voluntary ride, I think if there was a legitimate safety concern, he could keep the gun separate and keep it in the front, which I think he testified he would have done, and then return it to him upon getting him to his destination. But I do not think that he could investigate because even if he could investigate the gun and detain him to do it, any safety concern would still be present even if it was lawful. But he couldn't do that without some indication that the gun was being unlawfully carried. I think Judge Seiler might have had one more question. I'm just going to ask, did the officer ask your client his name originally or was that after he searched him? I think he testified it was after he was in the car that he finally ascertained his ID. Did he have a right to check it out to see if he was a fugitive or anything like that while he was driving him down the road? I think if he had done it while he was driving him home, he could, but if he delayed the detention, then that is a detour and he's prolonging the scope of the detention without reasonable suspicion to support that. All right. Thank you very much. Thank you both. Thank you. Thank you.